**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

MARK ERIC JARECKE,                    :
                                      :
    Plaintiff                        :
                                      :         PRISONER CASE NO.
    v.                               :         3:07-cv-1281 (JCH)
                                      :
RONALD HENSLEY, ET AL.,               :
                                      :         JULY 9, 2009
    Defendants                       :

**RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Doc. No. 42)**

Plaintiff Mark Jarecke ("Jarecke"), currently confined at the Osborn Correctional

Institution ("Osborn") in Somers, Connecticut, commenced this civil rights action <u>pro se</u>

pursuant to 28 U.S.C. § 1915.  He names as defendants psychiatrist Dr. Ronald

Hensley ("Dr. Hensley"), Lieutenant Jack Cupka ("Cupka"), licensed social worker

Rebecca Ewald[1] ("Ewald"), clinical social worker Merry Moriarty ("Moriarty"), Warden

David Strange ("Strange"), and nurse Patricia Wollenhaupt ("Wollenhaupt").  Jarecke

alleges that defendants were deliberately indifferent to his mental health needs,

attempted to transfer him to another facility with dormitory housing, and blocked his

access to the courts.  Defendants have filed a motion for summary judgment, and

Jarecke has responded through appointed counsel.

**I.      STANDARD OF REVIEW**

In a motion for summary judgment, the burden is on the moving party to

establish that there are no genuine issues of material fact in dispute and that it is

entitled to judgment as a matter of law.  <u>See</u> Rule 56(c), Fed. R. Civ. P.; <u>Anderson v.</u>

<u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986).  The moving party may satisfy this

---

[1]Plaintiff incorrectly named this defendant in the complaint as Rebecca Eward.

burden "by showing—that is pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 105 (2d Cir. 2002) (per curiam) (internal quotation marks and citations omitted). Once the moving party meets this burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 250, and present such evidence as would allow a jury to find in his favor in order to defeat the motion for summary judgment. Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

When reviewing the record, the court resolves all ambiguities and draws all permissible factual inferences in favor of the party against whom summary judgment is sought. Patterson v. County of Oneida, N.Y., 375 F.3d 206, 219 (2d Cir. 2004). If there is evidence in the record on a material issue from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is inappropriate. Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82-83 (2d Cir. 2004). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252.

## II.    FACTUAL BACKGROUND[2]

### A.    Mental Health Treatment

Jarecke was confined at Osborn since November 12, 2002, except for a one-day

stay at Willard-Cybulski Correctional Institution ("Willard-Cybulski") on July 12, 2006.

Throughout his incarceration, Jarecke has been seen and evaluated by several

different mental health professionals at various correctional facilities.  The diagnoses

include polysubstance abuse, bipolar disorder, antisocial personality disorder, and

depression, and rule out bipolar disorder and post traumatic stress disorder ("PTSD").

Dr. Hensley first met Jarecke in December 2004.  Jarecke was referred to Dr.

Hensley by a psychiatric social worker because Jarecke was experiencing bouts of

depression and poor sleep habits.  He also wanted to restart medications.  After

reviewing Jarecke's medical and mental health records and meeting him, Dr. Hensley's

initial impression was that Jarecke's history and behaviors were much more consistent

with antisocial personality disorder and borderline personality disorder than with bipolar

disorder. This diagnosis was confirmed during the three years that Dr. Hensley treated

Jarecke.

Jarecke has a history of substance abuse and behavioral problems; suicide

threats and reported suicide attempts; fairly rapid mood swings; persistent agitated

feelings, known as dysphoria; and a tendency to blame or criticize persons with whom

---

[2] The facts are taken from Defendants' Local Rule 56(a)1 Statement (Doc. No. 42-3).  Although plaintiff filed a Local Rule 56(a)2 Statement (Doc. No. 87), he has not complied with the requirements of the local rule.  See D. Conn. L. Civ. R. 56(a)3 ("each denial in an opponent's Local Rule 56(a)2 Statement [] must be followed by a specific citation to (1) the affidavit of a witness competent to testify to the facts at trial and/or (2) evidence that would be admissible at trial").  The rule cautions litigants that failure to comply with this "specific citation" requirement may result in the Court deeming admitted properly supported facts in the movant's Local Rule 56(a)1 Statement.

he disagrees.  These are characteristics commonly associated with antisocial personality disorder and borderline personality disorder.  Bipolar disorder is characterized by months of depression alternating with weeks of mania.  Sometimes bipolar disorder is accompanied by psychosis.  Psychotic patients are unable to think through their actions and rarely can logically explain their actions.

Jarecke's records and letters show that he can display mood changes from day to day and within a day.  Such rapid mood fluctuations are not indicative of bipolar disorder.  They show problems of longstanding maladaptive personality traits consistent with antisocial personality disorder and borderline personality disorder.  Jarecke's medical records frequently reflect that he shows no evidence of psychosis and appears quite articulate and stable with normal thought processes.  He maintains a full-time job in the prison clothing factory which requires high precision, skill, and focus.  Psychiatrists Hensley and Suzanne Ducate opine that Jarecke's history and behavior are consistent with a diagnosis of antisocial personality disorder and borderline personality disorder and not with a diagnosis of bipolar disorder.

Many prisoners suffer from antisocial personality disorder.  They frequently have difficulty with authority figures and are difficult to treat.  Although medications may be used periodically to treat symptoms such as depression and impulsivity, medical research does not support the use of medications to treat antisocial personality disorder or borderline personality disorder.

Throughout his time in the community and his incarceration, Jarecke has been prescribed several different medications.  In 2003 and 2004, prior to his treatment by Dr. Hensley, Jarecke was prescribed Geodon for anger and impulsivity and Remeron,

4

an antidepressant.  After a time, the orders were discontinued because Jarecke refused to take any medications.  In December 2004, despite the diagnosis of antisocial personality disorder and borderline personality disorder, Dr. Hensley noted that Jarecke might benefit from judicious use of medication.  Dr. Hensley's preferred medications were Prozac or Paxil.  Jarecke refused to take either medication because his father had committed suicide while taking Prozac.  Thus, Dr. Hensley restarted him on Remeron. In addition to evaluating and prescribing his medications, Dr. Hensley saw Jarecke for regular counseling sessions from December 2004 through September 2007.  During some of his counseling sessions with Dr. Hensley, Jarecke reported hoarding his Remeron and buying medication from other inmates.  He also reported experiencing claustrophobia and having issues with dormitory housing.

Beginning in January 2006, Jarecke attended monthly cognitive behavioral sessions with licensed clinical social workers.  Social worker Ewald ran the sessions from January 2006 through June 2006.

Over time, Jarecke's security level decreased to level 2 and his parole eligibility date, October 2008, approached.  As security levels are lowered and discharge nears, inmates customarily are transferred to less restrictive facilities to ease the transition back into the community.  Jarecke's name appeared on custody transfer lists three times in 2006.  Each time, when custodial staff attempted to transfer Jarecke to Willard-Cybulski or Carl Robinson Correctional Institution ("Robinson"), Jarecke refused to be transferred.  He stated that he could not live in a dormitory setting because he needed more open space.  He also stated that dormitory conditions would cause him stress because he was raised in rural Virginia.

5

Jarecke had no mental health condition in 2006 that would preclude his transfer to Willard-Cybulski or Robinson and still does not.  Both facilities have psychiatric staff and many inmates suffering from antisocial personality disorder, borderline personality disorder and/or PTSD have been successfully transferred there to prepare for their return to the community.  It is Dr. Hensley's opinion that Jarecke should, at least, have made an effort to experience the less restrictive environment before being released from prison.

In December 2005, Dr. Hensley determined that Jarecke might benefit from case management services and asked Ewald to be his case manager.  Ewald served as Jarecke's case manager through June 2006.  She developed a treatment plan to address Jarecke's symptoms and met with him at least once a month.  In May 2006, Jarecke was designated for transfer to Willard-Cybulski for population bed space reasons.  Before any inmate is transferred to another correctional facility, mental health staff reviews his chart to determine whether the transfer is inappropriate for any mental health reason.  Ewald reviewed Jarecke's chart on May 18, 2006, and concluded that there was no mental health reason that would prevent the transfer.  Jarecke, however, refused to be transferred to Willard-Cybulski.

Early in 2006, Ewald became concerned that Jarecke was becoming attached to her and viewing her as more than a mental health professional.  Her concerns were reinforced by some of Jarecke's journal entries which he shared with her.  Ewald was concerned that she would be unable to maintain a productive professional relationship and that he might be refusing to leave Osborn because of her.   After discussing these concerns with Dr. Hensley, Jarecke was assigned another case manager.  Ewald's last

6

meeting with Jarecke as his case manager was on June 30, 2006.

Social worker Moriarity had several contacts with Jarecke but never served as his case manager.  On July 12, 2006, Moriarity was called to the admitting and processing area at Osborn because Jarecke was refusing to go to Willard-Cybulski.  When Jarecke told her that he could not live in a dormitory, Moriarity thinks she told him that he should give it a chance.

On November 7, 2006, custody staff was preparing to transfer Jarecke to Robinson for bed space reasons.  Jarecke was refusing to go to a facility with dormitory housing.  As the mental health professional on duty, Ewald was asked to speak with Jarecke.  She told him that he was not under any mental health hold that would prevent his transfer.  Upon hearing this, Jarecke became agitated.  Cupka spoke to Jarecke, determined that Jarecke would not agree to the transfer, and ordered him escorted to the restrictive housing unit.  Ewald conducted a mental health evaluation, which is required before any inmate is placed in restrictive housing.  Jarecke was upset and refused to agree not to harm himself.  As a result, Ewald asked that Jarecke be escorted to the Hospital 2 Unit at Osborn for close monitoring.  Correctional staff reported that the escort of Jarecke from G basement to the restrictive housing unit and then to Hospital 2 Unit was routine.  Jarecke states, however, that force was used during the transfer.  Ewald recalls no inappropriate behavior.  Later, Ewald complied with a request to prepare a statement concerning her November 7, 2006, conversation with Jarecke and the absence of any mental health hold.

During a December 21, 2006 staff meeting, mental heath staff discussed Jarecke's recent requests to be seen on an emergency basis on second shift.  Staff

thought that Jarecke was making the request in the hope of seeing Ewald, who was on duty during the second shift.  Shortly after the meeting concluded, the mental health unit received a call from the housing officer stating that Jarecke was having a mental health emergency and needed to see Ewald.  Moriarity was on duty and responded to the call.  Jarecke told her to leave and not to speak to him.  Moriarity told Jarecke of the concerns expressed at the staff meeting and informed him that the team decided to increase his mental health classification or place him in the hospital unit for close monitoring if he continued to ask for Ewald or seek emergency attention when there was no emergency.  Jarecke then threatened Moriarity with a lawsuit.

Although he believed that Jarecke would benefit from a transfer to a less restrictive facility, Dr. Hensley agreed, in December 2006, to put a short-term mental health hold on Jarecke.  They agreed to a hold of one year, during which time Jarecke would work toward progressing to a dormitory setting and lower custody level.

In May 2007, Dr. Hensley discontinued the Remeron at Jarecke's request.  He also increased Jarecke's Benadryl dose.  Benadryl is an antihistamine that is also used as a sleeping aid.

Jarecke failed to progress toward the goal of dormitory housing.  He lashed out at mental health staff for betraying his trust and attempting to transfer him to another facility.  Dr. Hensley concluded that he no longer could maintain a therapeutic relationship with Jarecke and, in August 2007, terminated his counseling sessions with Jarecke and recommended that Physician Assistant Frick ("Frick") begin prescribing Jarecke's medication.  Dr. Hensley recommended that Jarecke continue his monthly behavioral therapy sessions with social worker Power.

Jarecke first met Frick in August 2007.  They discussed Jarecke's history of medication hoarding and the fact that Benadryl generally is used as a sleeping aid on a temporary basis.  Jarecke reported no insomnia and Frick observed no evidence of insomnia.  Therefore, Frick ordered that the Benadryl be tapered and discontinued over a twenty-day period.  In September 2007, Frick noted in Jarecke's chart that he would recommend continuation of cognitive behavioral therapy prior to prescribing any medications.  In making this determination, Frick considered Jarecke's history of hoarding medication and the fact that behavioral therapy could improve Jarecke's outlook and mood swings.

Frick next met with Jarecke in January 2008.  He listed a number of medications that Jarecke had been prescribed in the past and discussed how each one might improve Jarecke's mood swings and racing thoughts.  Because Jarecke could not identify what triggered the mood swings or indicate the number of good versus bad days, Frick asked him to keep a journal of mood swings and anything that might trigger them.  Power would inform Frick if any medication were needed.  Jarecke did not keep the journal.  Frick's notes of their meetings indicate that Jarecke appeared stable, calm, and communicative.  He maintained a job in the prison clothing shop and his mental status appeared quite good with no current evidence of suicidal intent or psychosis.

On March 10, 2008, Jarecke requested that he be prescribed lithium.  A highly toxic medication requiring close monitoring, lithium is not used for direct treatment of antisocial personality disorder and borderline personality disorder.  Lithium is primarily used to treat mania in manic-depressive patients.  Although Jarecke was doing reasonably well and was in no apparent danger if he did not receive lithium, Drs.

9

Hensley and Ducate agreed to prescribe Lithium Citrate under very strict monitoring. They opined that, if they accommodated his medication request, Jarecke would be encouraged to focus on future parole possibilities and needed behavioral changes rather than on perceived past injustices.

Jarecke has no mental health condition that would require a single cell. He has had different cellmates during his period of incarceration and had not experienced any unusual problems. If he did experience problems with a particular cellmate, the situation could be reviewed by correctional and mental health staff to determine whether a change in cellmate was needed.

B.     Refusal to Transfer and Disciplinary Hearing

On November 7, 2006, correctional staff decided to transfer Jarecke to another facility because bed space was needed at Osborn. Correctional staff processing Jarecke for transfer to Robinson contacted Cupka and told him that Jarecke was refusing to be transferred. When Cupka arrived in G basement, Jarecke told him that he was not eligible for transfer to a facility with dormitory housing because of mental health problems. Mental health staff informed Jarecke that there was no mental health hold that would prevent his transfer. When Jarecke continued to insist that he could not be transferred, Cupka decided that he could not negotiate indefinitely about the transfer. He informed Jarecke that he would transfer to Robinson or be placed on administrative detention status pending a disciplinary hearing. In response, Jarecke became angry and threatened to sue Cupka. Correctional Officer Manning, the officer attempting to process the transfer, issued Jarecke a disciplinary report for flagrant disobedience.

10

Cupka decided that Jarecke should be handcuffed and escorted to segregation. He requested a video camera in case use of force became necessary during the escort. However, Jarecke was escorted to the restrictive housing unit without incident. Correctional staff stated that use of force was not required, while Jarecke states that force was used.  Upon completion of the escort, the videotape was delivered to the captain's office to be logged and kept for a period of time.  Cupka has not seen or had custody of the videotape since November 7, 2006.

According to standard practice, when he arrived at the restrictive housing unit, Jarecke was interviewed by mental health staff.  When Jarecke refused to contract for his safety or agree not to hurt himself, he was taken to the Hospital 2 Unit and placed on a fifteen minute watch.

Lieutenant Cormier was the disciplinary hearing officer assigned to the November 21, 2006 disciplinary hearing.  Cupka was not asked to testify at the disciplinary hearing and had no further involvement in the matter after he escorted Jarecke to the restrictive housing unit and then to the hospital unit.  Before the hearing, no one requested that the videotape be reviewed at the hearing,[3] and the videotape was not mentioned in the reports of the investigating officer or Jarecke's advocate.

Jarecke requested only one witness at the hearing, defendant Ewald.  In lieu of her testimony, the hearing officer considered Ewald's sworn statement concerning her conversation with Jarecke on the evening of November 7, 2006.  Jarecke's advocate prepared, and Jarecke signed, a statement summarizing Jarecke's position.  The

---

[3]According to Jarecke's Affidavit, he did, however, request that the tape be reviewed as part of his Disciplinary Hearing Appeal.

11

investigator also submitted a report of the facility's findings and recommendations.  At the hearing, Jarecke presented his argument that, contrary to the other evidence presented, he could not be transferred to Robinson for mental health reasons.  The disciplinary hearing officer found sufficient evidence to support a guilty finding on the charge of flagrant disobedience.  Jarecke was sanctioned with fifteen days confinement in segregation, thirty days loss of recreation, and sixty days loss of telephone privileges.

Although the videotape of a planned use of force must be kept for ten years, videotapes of routine escorts are recycled after thirty days unless the captain is told to keep a particular tape because a complaint has been filed.  No one asked the captain to retain the videotape of Jarecke's escort, and he was not aware of any complaint regarding the escort.  Thus, after approximately two months, the videotape was recycled.

Early in 2007, Jarecke wrote to Warden Strange complaining about the attempt to transfer him on November 7, 2006, and the disciplinary report he received for refusing to transfer.  Strange informed Jarecke that disciplinary appeals should be taken to the district administrator, not the warden.

C.    Complaints and Grievances

On August 18, 2007, Jarecke wrote to the security division complaining about his mental health care at Osborn.  On September 4, 2007, he sent an inmate request containing similar complaints to Strange.  On September 8, 2007, he wrote to Commissioner Lantz, complaining about the attempted transfers and mental health staff and demanding a single cell.  Strange was asked to review Jarecke's complaints.  Because Strange is not a mental health professional, he requested that the mental

12

health staff review the issues and report to him.  Psychologist Walter Krauss, the Director of Mental Health for Correctional Managed Health Care, contacted Jarecke and reviewed his complaints.

Strange reviewed information from Drs. Hensley, Ducate and Krauss and Physician Assistant Frick and concluded that Jarecke has received extensive mental health services from a number of mental health professionals.  None of these professionals had opined that there was any mental health reason precluding Jarecke's transfer to a correctional facility with dormitory housing or that would require that he be confined in a single cell.

During 2007, Jarecke also filed a number of medical and line grievances.[4] Jarecke usually failed to comply with grievance filing requirements.  As a result, Nurse Wollenhaupt, who reviewed medical grievances, and Dennis Morgan, the line grievance coordinator, would return the grievance to Jarecke with an explanation of why the grievance was being returned to enable him to correct the problem and resubmit the grievance.  For example, the rules require that each grievance is restricted to only one grievable matter and that the grievance be set forth in the space provided on the form plus one additional page.  Jarecke's grievances were lengthy and referenced numerous problems, some of which were not grievable matters.

## III.   DISCUSSION

Defendants have moved for summary judgment on six grounds: (1) any claims for damages against the defendants in their official capacities are barred by the

---

[4]Line grievances relate to all grievable matters other than health care related grievances.

Eleventh Amendment; (2) the defendants have not violated plaintiff's constitutional rights regarding his mental health treatment; (3) plaintiff has no constitutional right to be housed in a single cell or in any particular correctional facility; (4) the defendants did not violate plaintiff's right to due process regarding the issuance of a disciplinary report on November 7, 2006, or at the associated disciplinary hearing; (5) the defendants are protected by qualified immunity; and (6) the court should either decline to exercise supplemental jurisdiction over any state law claims for intentional spoliation of evidence or find that there is no evidence of intentional spoliation of evidence by any defendant.

      A.    <u>Eleventh Amendment Immunity</u>

Defendants first argue that any claims for damages asserted against them in their official capacities are barred by the Eleventh Amendment. The court agrees. Absent any waiver of immunity by the state or congressional order, the Eleventh Amendment bars a damages action against the state in federal court. <u>See</u> <u>Kentucky v. Graham</u>, 473 U.S. 159, 169 (1985). This immunity extends to state officials sued in their official capacities because any recovery would be obtained from the state treasury. <u>See id.</u> at 165-66, 169-70.

Jarecke seeks damages against all defendants but does not specify individual or official capacity. To the extent that he seeks damages from the defendants in their official capacities, the relief is barred by the Eleventh Amendment. Defendants' motion for summary judgment is granted as to all claims for damages against the defendants in their official capacities.

B.      Transfer Among Correctional Facilities and Single Cell Assignment

Jarecke alleges that the defendants tried to transfer him to a lower security correctional facility with dormitory housing.  He alleges that living in a dormitory setting would exacerbate his mental illness.   Because he was raised in rural West Virginia, Jarecke states that he must be confined in a single cell.  The court considers the attempted transfer as it relates to his mental health treatment below.  Here, the court considers whether Jarecke can assert an independent claim that his housing assignment can be considered unconstitutional conditions of confinement.

Inmates have no constitutional right to be housed in any particular correctional facility.  See Olim v. Wakinekona, 461 U.S. 238, 248-49 (1983) (inmates have no right to be confined in a particular state or a particular prison within a given state); Meachum v. Fano, 427 U.S. 215, 225 (1976) (transfer among correctional facilities, without more, does not violate inmate's constitutional rights, even where conditions in one prison are "more disagreeable" or the prison has "more severe rules").  Although Jarecke finds dormitory housing disagreeable, his transfer to a lower security facility does not violate his constitutionally protected rights.

Jarecke also has no constitutionally protected right to be housed in a single cell. Jarecke's conditions of confinement must meet "minimal civilized measure of life's necessities."  Wilson v. Seiter, 501 U.S. 294, 298 (1991).  This encompasses only "adequate food, clothing, shelter, sanitation, medical care, and personal safety." Wolfish v. Levi, 573 F.2d 118, 125 (2d Cir. 1978), rev'd on other grounds sub nom. Bell v. Wolfish, 441 U.S. 520 (1979).  Sharing a cell with another inmate does not deprive an inmate of adequate shelter and is not unconstitutional.  See Rhodes v. Chapman,

15

452 U.S. 337, 347 (1981) (holding that double-celling inmates did not rise to the level of a constitutional violation).

Jarecke also argues that he has a substantive due process right to a single cell and claims that the denial of a single cell demonstrates a failure to provide proper mental health care.  He argues that involuntarily-committed mental patients are entitled to services necessary to ensure their reasonable safety.  See Youngberg v. Romero, 457 U.S. 307, 314-16 (1982).  Jarecke, however, was not involuntarily committed as a mental health patient.  He is incarcerated as a result of his criminal conviction.  Prisoners have a lesser entitlement to considerate treatment and conditions of confinement.  Id. at 321-22.  In addition, Jarecke has not presented any evidence that his mental health conditions require that he be confined in a single cell.  His own opinion or personal preference is insufficient to establish the denial of a constitutional right.  Absent any evidence that such an accommodation is medically required, Jarecke fails to state a cognizable claim.

Defendants' motion for summary judgment is granted as to all claims that denying a single cell or transferring Jarecke to a correctional facility with dormitory housing violated his constitutional rights.

C.    Interference with Access to the Courts

Jarecke alleges that medical grievance coordinator Wollenhaupt and line grievance coordinator Dennis Morgan interfered with his access to the courts by failing to properly address his medical and custody grievances.

While state law can create a property or liberty interest, the deprivation of which is protected by the federal constitution, failure to comply with state rules does not

constitute a constitutional violation cognizable under section 1983. "A state cannot be said to have a federal due process obligation to follow all of its procedures; such a system would result in the constitutionalizing of every state rule, and would not be administrable." Levine v. Torvik, 986 F.2d 1506, 1515 (6th Cir. 1993) (citing Engle v. Isaac, 456 U.S. 107 (1982)), overruled in part on other grounds by Thompson v. Keohane, 516 U.S. 99, 111 (1995); cf. Ruocco v. Tung, No. 3:02cv1443(DJS), 2004 WL 721716, at *14 (D. Conn. Mar 30, 2004) (finding no federal obligation to follow prison grievance procedures); Hunnicutt v. Armstrong, 305 F. Supp. 2d 175, 188 (D. Conn. 2004) (same), aff'd in part, rev'd in part on other grounds, 152 Fed. Appx. 34 (2d Cir. 2005). This court concludes that Jarecke had no federal constitutional right to have Wollenhaupt or Morgan comply with institutional rules.

Further, Jarecke fails to show that he was denied access to the courts. It is well settled that inmates have a First Amendment right of access to the courts. Lewis v. Casey, 518 U.S. 343, 350 (1996); Bounds v. Smith, 430 U.S. 817, 828 (1977). To survive summary judgment, Jarecke must present evidence showing that he suffered an actual injury. See Lewis, 518 U.S. at 351-52. Jarecke fails to identify any case that was dismissed because he did not fully exhaust his institutional remedies and, in fact, he commenced this action. Thus, the court can discern no basis for a claim of denial of access to the courts.

    D.    Deliberate Indifference to Serious Mental Health Needs

Deliberate indifference by prison officials to a prisoner's serious medical or mental health need constitutes cruel and unusual punishment in violation of the Eighth

17

Amendment.  Estelle v. Gamble, 429 U.S. 97, 104 (1976).  To prevail on such a claim, Jarecke must allege "acts or omissions sufficiently harmful to evidence deliberate indifference" to his serious medical need.  Id. at 106.

Mere negligence will not support a section 1983 claim: "the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law . . . ."  Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003).  Thus, "not every lapse in prison medical care will rise to the level of a constitutional violation."  Id.  Rather, "[a]n official acts with the requisite deliberate indifference when that official knows of and disregards an excessive risk to inmate health or safety, a state of mind equivalent to the familiar standard of recklessness as used in criminal law."  Id. (citations and internal quotation marks omitted).  Inmates do not have a constitutional right to a model system of treatment.  Dean v. Coughlin, 804 F.2d 207, 215 (2d Cir. 1986).  Mere disagreement with prison officials about what constitutes appropriate care does not state a claim cognizable under the Eighth Amendment.  "So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."  Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir. 1998).

There is both a subjective and objective component to the deliberate indifference standard.  Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994).  The alleged deprivation must be "sufficiently serious" in objective terms.  Wilson, 501 U.S. at 298. "[A] condition of urgency, one that may produce death, degeneration, or extreme pain" must exist.  Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996) (internal quotations and citations omitted).  Subjectively, the defendant must have been actually aware of a substantial risk that the inmate would suffer serious harm as a result of his actions or

18

inactions.  Salahuddin v. Goord, 467 F.3d 263, 280 (2d Cir. 2006).

The basis of Jarecke's deliberate indifference claim is that Dr. Hensley diagnosed him with antisocial personality disorder and borderline personality disorder rather than bipolar disorder.  While Jarecke's medical records indicate that he was treated for bipolar disorder prior to his incarceration, the most frequent diagnoses from correctional mental health staff during his incarceration included antisocial personality disorder, borderline personality disorder, PTSD, substance abuse, depression and rule out bipolar disorder.  In the summer of 2003, the psychiatrist treating Jarecke prior to Dr. Hensley diagnosed Jarecke with antisocial personality disorder and ruled out bipolar disorder.  See Pl.'s Aff., Ex. F.  The most recent diagnosis, in March 2009, was mood disorder, polysubstance abuse and personality disorder with borderline and antisocial traits.  See id., Ex. I.

Physicians can and do differ in their diagnoses and their determinations of the appropriate treatment for a particular patient.  That difference of opinion does not establish a claim of deliberate indifference.  See Estelle, 429 U.S. at 107 (holding that questions of diagnosis and treatment implicating medical judgment are at most medical malpractice, not deliberate indifference to serious medical needs).  Jarecke has provided only his medical records in opposition to the motion for summary judgment.  Those records show that his treatment providers have considered various diagnoses including bipolar disorder, depression, antisocial personality disorder, borderline personality disorder, substance abuse, and PTSD.  He provides no expert medical opinion suggesting that the diagnosis of antisocial personality disorder and borderline personality disorder was improper.  Further, Jarecke's mental health records show that

several other treatment providers reached the same diagnosis as Dr. Hensley.  Thus, Jarecke has not provided evidence showing that his mental health diagnosis and treatment exhibited deliberate indifference to Jarecke's serious medical needs.  See Chance, 143 F.3d at 703.

In addition, Jarecke's own opinion that the defendants failed to provide proper mental health care does not state a constitutional claim.  A difference of opinion between a prisoner and prison officials regarding medical treatment does not, as a matter of law, constitute deliberate indifference.  Id.

The court concludes that Jarecke has failed to meet his burden of presenting evidence demonstrating a genuine issue of material fact on his claim of deliberate indifference to a serious mental health need.  Thus, defendants' motion for summary judgment is granted on this ground.

E.    Disciplinary Report and Disciplinary Hearing

Jarecke alleges that he was improperly issued a disciplinary report for refusing to transfer to a less restrictive facility and that defendant Strange failed to address his concerns regarding the disciplinary report and hearing.  Jarecke did not name as a defendant the correctional officer who issued the disciplinary report.  The court assumes that Jarecke considers defendant Cupka responsible for issuance of the disciplinary report because Cupka stated that Jarecke refused to be transferred.

Inmates have "no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest," Freeman v. Rideout, 808 F.2d 949, 951 (2d Cir. 1986), absent an additional factor "such as retaliation against the prisoner for exercising a constitutional right,"

20

Boddie v. Schnieder, 105 F.3d 857, 862 (2d Cir. 1997).  They must, however, have the opportunity to rebut the allegedly false charges at a hearing.  See Jones v. Coughlin, 45 F.3d 677, 679-80 (2d Cir. 1995).  Jarecke was afforded a disciplinary hearing on the charge, and the court concludes below that he fails to establish a due process violation.  Thus, Jarecke fails to state a cognizable claim against defendant Cupka for false accusation.

Jarecke challenges the disciplinary hearing because the videotape of his escort to restrictive housing and the hospital unit was not presented.  To state a claim for violation of procedural due process at the hearing, Jarecke must show that he had a protected liberty interest and that he was deprived of that interest without being afforded due process of law.  Sandin v. Conner, 515 U.S. 472 (1995).  He has a protected liberty interest only if the state created a liberty interest in a statute or regulation and the deprivation of that interest caused him to suffer an atypical and significant hardship.  See Tellier v. Fields, 280 F.3d 69, 80-81 (2d Cir. 2000).  To prevail on his due process claim, Jarecke must demonstrate both that, as a result of the guilty finding, he suffered an atypical and significant hardship in relation to the ordinary incidents of prison life and that the state has created a protected liberty interest in freedom from such disciplinary sanctions.

Jarecke contends that the disciplinary hearing was improper.  He argues that the videotape of his escort should have been preserved and presented at the disciplinary

21

hearing.[5]  He claims that the videotape would show that he did not refuse to transfer, although he contends that it will show that excessive force was used.  Despite his pleas that he was harmed by the destruction of the videotape, Jarecke does not argue that he could not present his version of events at the hearing.  Furthermore, although Jarecke characterizes his behavior as not refusing to transfer, Jarecke conveyed to prison staff that he should not be transferred because of his mental health issues, even though there was no mental health hold in effect at the time of the transfer and the mental health staff told him that there was no mental health reason he could not be housed in a lower level facility.

Jarecke cannot rely merely upon the mandatory nature of language in prison directives regarding retention of videotapes to demonstrate a violation of due process. An inmate's right to have relevant laws, regulations, and directives obeyed is not a federal right protected by the civil rights statute or the Constitution.  See Smith v. O'Connor, 901 F. Supp. 644, 647-48 (S.D.N.Y. 1995) (citing cases).

As a result of the guilty finding, Jarecke was sanctioned with fifteen days confinement in punitive segregation, thirty days loss of recreation, and sixty days loss of telephone privileges.  Jarecke presents no evidence showing that his conditions of confinement in punitive segregation differ from the conditions of other inmates.  Under Sandin, the court must compare the conditions described by the plaintiff with the conditions an inmate generally can expect from prison life to determine whether the

---

[5]Jarecke states in his Opposition to the Motion for Summary Judgment that the videotape would have shown that excessive force was used during the escort.  He does not, however, assert a claim of use of excessive force in this action.

conditions constitute an atypical and significant hardship.  Sandin, 515 U.S. at 485-86.

Although Jarecke has presented no evidence of the conditions of confinement in punitive segregation, courts considering this issue have held that sanctions similar to those Jarecke received do not rise to the level of an atypical and significant hardship.

Inmates should reasonably anticipate confinement in segregation.  See Russell v. Scully, 15 F.3d 219, 221 (2d Cir. 1993); Cespedes v. Coughlin, 956 F. Supp. 454, 470-71 (S.D.N.Y. 1997) (citing cases).  Jarecke's sanctions, fifteen days confinement in segregation followed by thirty days loss of recreation and sixty days loss of telephone privileges, are similar to sanctions that other courts have determined were not sufficient to support a claim for denial of due process.  The court concludes that Jarecke's sanctions were not an atypical and significant hardship and do not give rise to a liberty interest under Sandin.  Defendants' Motion for Summary Judgment is granted on any federal claims regarding the disciplinary report and disciplinary hearing.

F.    State Law Claim

In opposition to the Motion for Summary Judgment, Jarecke continues to assert a state law claim for spoliation of evidence regarding the recycling of the videotape. The court denied Jarecke's request to amend his complaint to include this claim.  See Doc. No. 26.  Defendants argue that, even if this claim were included in the case, the court should decline to exercise supplemental jurisdiction over the claim.

Where all federal claims have been dismissed, the court may decline to exercise supplemental jurisdiction over state law claims.  See 28 U.S.C. § 1367(c)(3); Giordano v. City of New York, 274 F.3d 740, 754 (2d Cir. 2001) (collecting cases).  The court has granted defendants' Motion for Summary Judgment on all claims relating to the

23

issuance of the disciplinary report on November 7, 2006, and the associated disciplinary hearing.  Thus, the court declines to exercise supplemental jurisdiction over any possible state law claims relating to the recycling of the videotape.

## IV.    CONCLUSION

Defendant's Motion for Summary Judgment (Doc. No. 42) is **GRANTED** as to Jarecke's claims that defendants were deliberately indifferent to his mental health needs, attempted to transfer him to another facility with dormitory housing, and blocked his access to the courts.  The Clerk is directed to enter judgment and close this case.


**SO ORDERED.**

This 9th day of July 2009, at Bridgeport, Connecticut.


         /s/ Janet C. Hall        
Janet C. Hall
United States District Judge